In the Matter of Renee Lang, Appellant, against Marion Lang, Also Known as Marion Rothstein, Respondent.

First Department, December 15, 1959.

*Leonard Hemley* of counsel (*Stephen S. Bernstein* and *James H. Powell* with him on the brief; *McLaughlin & Stern*, attorneys), for appellant.

*Bernard Friedman* of counsel (*Lawrence G. Greene* with him on the brief; *Bernard Friedman*, attorney), for respondent.

BREITEL, J.   Involved in this habeas corpus proceeding is the custody of two Swiss boys, aged 10 and 8.   Their parents, also of Swiss nationality, were married, lived, and were divorced in Switzerland.   The Swiss courts first awarded custody to the mother, and then, for cause, transferred custody to the father.

The children were spirited away by the mother, in violation of Swiss law, from Switzerland to New York. The father, after invoking the aid of the New York courts to recover the custody of both children, in turn, spirited away the younger boy back to Switzerland with him in violation of the stipulation he had made to the New York court.

Because the younger son was removed by the father from this jurisdiction while the matter was *sub judice,* Special Term proceeded only with respect to the older son who remained in New York. As to him the court awarded custody to the mother, upon a finding that she had contracted a second marriage that appeared to have stability and promise of continuity, and that she was now free of the behavior that so disturbed the Swiss court. This was after a hearing. The award provided that the entire matter might be re-evaluated within six months. Special Term recognized that the parents, in their bitterness and lack of self-restraint, had brought about an intolerable situation, and the six-month ambulatory period was adopted in the hope that the parents might, in the interests of their own children, resolve the problem.

There are two controlling principles. First, the interests of the children, that is, their welfare, provide the primary basis for judicial action. Second, comity requires that, except in extraordinary circumstances, the fate of these Swiss children be determined exclusively by the Swiss courts which have domiciliary jurisdiction. Applying these principles, Special Term's order granting custody of the older son to the mother should be reversed, and an order entered directing delivery of the son to the father.

These are the pivotal events.

The parents were married in Switzerland in 1948. They were then, and remained throughout the marriage, resident nationals of that country. One child was born in 1949 and the other in 1951. In 1953 the parents were divorced by judicial decree in Switzerland. The custody of the sons was awarded to the mother until each had completed his 12th year. In 1955 the father applied to the Swiss court for a modification of the divorce decree in order to have custody transferred to him. He succeeded, and in 1957 the Court of Appeals of the Canton of Zurich affirmed the determination transferring the custody of the children. The mother's appeal to the Swiss Federal Supreme Court, the highest court in Switzerland, was dismissed for failure to prosecute.

The Swiss judicial determination, in the first instance, that the mother should have the custody of the children was based on a court-approved separation agreement. The court found, among other things, that the father had engaged in physical and psychological brutality toward the mother and had made an unwarranted charge that the younger son was not his own.

The later modification by the Swiss courts, which resulted in the transfer of custody to the father, was based primarily upon a finding by the lower Swiss court that the mother had violated the provisions of the divorce decree by removing the children from Switzerland and keeping them in the Bahamas, New York, Florida, and Mexico. The appellate court, however, expressly noted that the children's welfare was the decisive factor and that the mother's violation of the divorce decree in temporarily removing the children from Switzerland was only secondarily important. It stressed that the mother had been guilty of grossly improper conduct in the care of the children. It made an exhaustive inquiry, utilizing the investigation and recommendations of professionally trained persons in the relevant disciplines. After acknowledging that young children ordinarily belong with the mother, the court concluded that circumstances had so changed since the initial entry of the divorce decree that failure to effect a revision in custody would constitute considerable damage to the interests of the children.

Among its objective findings, the appellate court noted that the mother had left one of the children when he was seriously ill, and that she had moved from country to country with such rapidity as to preclude a continuity of family life or stable environment. It was found, on the other hand, that, during the periods of the father's custody, the children had been cared for excellently. He was characterized as " a faithful, good father who always endeavored to do what was best for the children ".

While the appeal was pending, the mother came to New York where she remarried in April, 1958. In February, 1959, while visiting with the children in Switzerland, which she was entitled to do under the modified Swiss decree, the mother took the children from Switzerland and brought them to New York to her new household without consent of the father or leave of the Swiss courts. When the children were taken from Switzerland, the father had recently remarried and was on his honeymoon.

On learning what had happened to the children, the father came promptly to New York and instituted this proceeding to recover the custody of his sons. While the proceeding was pending, he represented personally to the court that if permitted

to have visitation with his children he would not remove them from this jurisdiction. Despite his assurance, he left the United States, taking with him the younger son who is now in Switzerland.

The situation, then, which has resulted from the acts of the parents is that violence has been done to the law, and the courts of both jurisdictions have been flouted. But much more seriously, their own parents have achieved the separation of the two brothers, who, because of the turbulence in their short lives, are especially dependent upon one another. It was the mother who testified on the hearing at Special Term: "No one who loved the children would have attempted to separate them."

Of course, the conduct of the parents has produced another consequence. If the courts would undo what the inadequacy of the parents has brought about — by rejoining the children — they can do so only at the sacrifice of the principle that a contemptuous wrongdoer should have no standing to obtain relief in a court.

The problem, as so often occurs with respect to those that ensue from a broken home, leaving vengeful antagonistic parents, is not capable of perfect solution.

If the solution were to be controlled by the misconduct of the parents, it would be one easy to deduce. The courts of this State would grant no relief to the father. The Swiss courts, presumably, would grant no relief to the mother. The dignity of the several courts would be preserved, but the welfare of the children would be destroyed. The answer is, of course, that the parents' contempts of the courts must be a subordinate consideration. The solution, and this both parents readily concede, must depend solely on the children's welfare (*Matter of Bachman* v. *Mejias,* 1 N Y 2d 575, 581).

In determining what should be done in the interests of the children, there are some elemental rules.

A child's domicile is that of the parent to whose custody it has legally been given (*Matter of Thorne,* 240 N. Y. 444; *Matter of Billy,* 7 A D 2d 614; Restatement, Conflict of Laws, § 32; 1 Beale, Conflict of Laws, pp. 215–216). Here, the father has custody under the Swiss decree and both children, as well as their legal custodian, are still domiciliaries of Switzerland, despite their onetime presence here by reason of the mother's abduction.

The doctrine of comity has often been recognized as qualifiedly applicable to custodial decrees. When comity is applied it rests primarily on domiciliary jurisdiction, custody being, in some

respects a function of status which is controlled by the law of the domicile (Goodrich, Conflict of Laws [3d ed., 1949], pp. 421-424; 2 Beale, Conflict of Laws, pp. 716-722; 17A Am. Jur., Divorce and Separation, § 993; see, also, Restatement, Conflict of Laws, §§ 144-148; see *May* v. *Anderson*, 345 U. S. 528; *Matter of Guyette* v. *Haley*, 286 App. Div. 451). In applying comity it is sometimes required that distinction be made between domicile at the time of the foreign judicial determination and domicile when the matter arises in the domestic court. In this case the domicile of the children was never changed by reason of the mother's abduction but remained in Switzerland with that of the father, the legal custodian.

True, in matters of custody the courts are not obligated always to apply the doctrine of comity. Indeed, they are not required always to apply the more stringent constitutional principle based upon the extension of full faith and credit. In New York, it is settled that the mere physical presence of a child in the State is sufficient to confer on its courts power to make effective disposition for the child's welfare, including the determination of custody. This, indeed, has been described as a paramount jurisdiction. (*Matter of Bachman* v. *Mejias,* 1 N Y 2d 575, 580-581, *supra*; *Matter of Hicks* v. *Bridges,* 2 A D 2d 335, 339; *People ex rel. Pritchett* v. *Pritchett,* 1 A D 2d 1009, affd. 2 N Y 2d 947.) Thus, it has been expressly held that the full faith and credit clause in the Federal Constitution does not apply to custody decrees and that the responsibility of the New York courts as *parens patriæ* transcends the rule of comity (*Matter of Bachman* v. *Mejias, supra*). The rule is the same in most other jurisdictions (Ann., Custody of Child-Jurisdiction, 4 A. L. R. 2d 7 *et seq*.).*

But the existence of power in the court to ignore the Swiss decree and depart from principles of comity does not mean that the power should be exercised in the absence of extraordinary circumstances demonstrating that otherwise the children will suffer (*Finlay* v. *Finlay,* 240 N. Y. 429; *Wicks* v. *Cox,* 146 Tex. 489; see *Matter of Sutera* v. *Sutera,* 1 A D 2d 356; cf. *Arpels* v. *Arpels,* 9 A D 2d 336). In the *Wicks* case, after citing and quoting from the *Finlay* case, the Texas court cogently said (pp. 493-494): " Ordinarily the courts of the domiciliary state are in a better position to pass intelligently on the matter of the child's welfare, and good order frequently requires that they do so to the exclusion of courts of other states in which the child

---

* In the United States Supreme Court, the effect of the full faith and credit clause on judicial custody determinations is still an open question (*Kovacs* v. *Brewer,* 356 U. S. 604, 607 and dissenting opinion by Mr. Justice FRANKFURTER).

is temporarily resident." And the crux of the matter here is that only by withholding the power may the interests of the children be served.*

Certainly, neither the *Bachman* nor the *Hicks* cases (*supra*) are authority to the contrary. In the *Bachman* case, withholding the power would have given effect to an order of a foreign court separating a child from his mother, brother and sister, and placing him, without a hearing, in the temporary custody of his paternal grandfather. There were positive findings based upon the supervening psychological and moral effect upon the child. In the *Hicks* case, withholding the power might have impaired the very custody of the parent to whom the foreign court had awarded custody. There had been no hearings and the allegations raised issues as to the inter-parental motivation and the dire effect of a removal of the children upon their education and adjustment. Thus, in both cases, extraordinary circumstances, supervening and relating to the welfare of the children, were present.

Indeed, in the *Hicks* case, after observing that the court in the jurisdiction in which the child is present has a paramount jurisdiction, it was, nevertheless, stated (p. 339) that in exercising such jurisdiction "the court, of course, must walk a very narrow line, because, as stated in the *Finlay* case (240 N. Y. 429, 431, *supra*), ' The residence of the child may not be used as a pretense for the adjudication of the status of parents whose domicile is elsewhere, nor for the definition of parental rights dependent upon status. * * * Parents so situated must settle their

---

* This view is precisely that attributed to the Scottish courts by the Council of The Law Society of Scotland (Conflicts of Jurisdiction affecting Children, 4 J. L. Soc. Scotland 65, 66 [1959]). Because the statement is such a clear one it bears quotation: "Consistently with the foregoing, the Scottish courts have always adopted the view that if a child domiciled outside Scotland is physically present in Scotland and if the courts of the child's domicile have pronounced an order regarding the custody or control of the child the function of the Scottish courts is limited to giving aid in enforcing the orders of the courts of the domicile. As a modification of the latter principle the Scottish courts will be prepared to refuse to enforce an order of the courts of the domicile and will consider themselves free to assume jurisdiction to make an order inconsistent therewith in certain limited circumstances and for certain limited purposes. The exact scope of this limited jurisdiction based on physical presence as opposed to domicile is not clearly defined but the more modern judicial pronouncements indicate that it is still a subordinate jurisdiction to be exercised only where necessary to protect the child from what is by our standards an obvious danger, injury, hardship or ill-treatment." See, also, Anton, Conflicts of Jurisdiction in Questions of Custody (71 Scot. L. Rev. 205 [1955]). To the same effect, see *Nugent* v. *Vetzera* ([1866] L. R. 2 Eq. [Eng.] 704).

controversies at home. Our courts will hold aloof when intervention is unnecessary for the welfare of the child ' ' ".

Nor is it insignificant that in the *Hicks* case, the children who were present in New York, were resident here with their legal custodian. As noted earlier, the domicile of a child is that of the parent to whose custody it has been legally given. None of these qualifying elements are present in this case. And totally absent from this case is any element which indicates that the retention of either child is necessary to its well-being, as distinguished from the contention that the mother has recently become a fit guardian.

Of course, it never can be properly said because cases are decided on their particular facts, that therefore each is an empire to itself. Rational law involves generalization and therefore every judicial determination stems from and generates principles. Nevertheless, it is equally true that the application of each generalization requires close attention to the particular facts of every determination (because of the principles they generate, even if unexpressed) if false or incomplete reasoning is to be avoided. This is so, if overly broad or overly narrow generalization expressed in the past is to be recognized, or, if those generalizations to be made in the present are to be as sound as one can make them. In custody matters the caveat is particularly appropriate, and, therefore, the factual context as well as the generalizations in every precedent are to be approached with the most careful analysis.

This last may explain the seemingly, but not really, variant directions in which American courts have gone in custody matters involving foreign decrees. This, too, has sometimes suggested unnaturally particularistic approaches to the cases (see, e.g., the exhaustive collection and careful analysis of the cases in Ehrenzweig, Interstate Recognition of Custody Decrees, 51 Mich. L. Rev. 345). Nevertheless, even in child custody matters there is no reason to doubt that the law, if it is to be law and not some uncontrolled discretion, necessarily functions rationally through the application of general principles.

Adherence to the principle of comity provides the key to rational disposition for the welfare of the children, not only in this case, but in many, if not most, custody cases involving self-help. And for this reason: comity makes futile and thus discourages the resort to self-help which in the custody dispute is an irresponsible and barbaric remedy. Not only does self-help make the eventual placement of the children an arbitrary consequence but it breeds reprisal in kind, as, indeed, happened in this case.

So it is that while the principle of comity does not bind the courts of this State to accept the determination of a foreign domiciliary court, the principle nevertheless requires willing recognition, except in extraordinary circumstances affecting the health and welfare of the children. Such circumstances, usually, will not have existed or have been known to the foreign domiciliary court at the time it acted. In their absence, New York courts will yield readily to the domiciliary courts and not compound confusion by conflicting determinations or evaluations with regard to the same children (see *Ansorge* v. *Armour,* 267 N. Y. 492, 501).

Moreover, since the courts of this State have no longer any power over the child who has been removed, albeit improperly, to Switzerland, there is still further reason to accord comity to the Swiss courts. In no other practical way can the custody of the two brothers be handled in integrated fashion. One cannot expect the Swiss courts to surrender what has already been characterized as their domiciliary jurisdiction.

There is still further justification, too, on the merits. The custody of infant children is not to be shifted from parent to parent merely because the noncustodial parent has experienced an improvement in condition, status, or character. At least this is true so long as the custodial parent has not been shown to be unfit, or perhaps less fit, to continue to serve as the proper custodian. (E.g., *People ex rel. Glendening* v. *Glendening,* 259 App. Div. 384, affd. 284 N. Y. 598; *Matter of Standish,* 197 App. Div. 176, 183, affd. 233 N. Y. 689; *People ex rel. Ludden* v. *Winston,* 34 Misc. 21, affd. 61 App. Div. 614; *Matter of Jackson,* 19 Misc 2d 594; Restatement, Conflict of Laws, § 148.)

Thus, generally, the custody of children is to be established, whenever possible, on a long-term basis. Custody is not to be shuttled back and forth between divorced parents merely because of changes in their marital status, economic circumstances, or improvements in their moral or psychological adjustment. So, in this case there is the bizarre contention that the mother is entitled to custody because, since the Swiss decrees, she has improved in status and adjustment, although there is no suggestion that the father has since become less qualified or is unfit to care for the children.

It thus follows quite naturally that the custody awarded to the mother, albeit qualified in some measure for the period of six months, was not provident and the son who remains in New York should be returned to his father. It is recognized that in making this disposition, the court perforce is satisfying the claim of one who has acted irresponsibly and contemptuously towards

the court. That is a matter that can be handled otherwise, should circumstances permit, and is a factor which the Swiss courts may wish to consider should the mother seek relief there. The New York courts can well survive this offense to their dignity; the children should not, however, suffer further offense to their welfare.

Accordingly, the order, insofar as it denied petitioner's application for the delivery of Gerald Emil Lang and awarded the custody for a period of six months to the respondent, should be reversed, on the law and on the facts and in the exercise of discretion, the petition granted and an order entered directing the delivery of the child to the petitioner, without costs to either party.

Botein, Rabin, Stevens and Bergan, JJ., concur.

Order, insofar as it denied petitioner's application for the delivery of Gerald Emil Lang and awarded the custody for a period of six months to the respondent, unanimously reversed, on the law and on the facts and in the exercise of discretion, the petition granted and an order entered directing the delivery of the child to the petitioner, without costs to either party.