*In re* MARRIAGE OF LARRY H. WEINSTEIN, Petitioner-Appellee, and SUSAN G. WEINSTEIN, Respondent-Appellant.

First District (2nd Division)   No. 79-611

Opinion filed June 24, 1980.

Michael D. Gerstein, of Chicago (Arthur M. Berman, J. Scott Bonner, and Kirsch, Nadler & Berman, Ltd., of counsel), for appellant.

Jacobs, Camodeca & Timpone, of Chicago (Jerome Marvin Kaplan and Marc K. Schwartz, of counsel), for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Susan Weinstein (hereinafter the mother) appeals from the trial court's judgment awarding custody to her former husband, Larry Weinstein (hereinafter the father), of the two minor children of their marriage, Noah and Jason. The issues raised are whether the trial court lacked subject matter jurisdiction or alternatively was an inconvenient forum, and whether the judgment appealed from was manifestly unjust to the mother. For the reasons given below, we affirm and remand with directions.

The mother and father, both reared in Illinois, were married here in 1971; Noah was born in 1974 in Illinois, and Jason was born in 1976 in Montana. The first four years after they wed the parties lived in DeKalb, Illinois, where both obtained degrees from Northern Illinois University. In September of 1975, they moved to Bozeman, Montana, and a year later, into a house situated on farm property about 12 miles outside Bozeman. The father and mother discussed divorce in December of 1977. They agreed that he would spend two weeks with the boys at his parents' home in Skokie, Illinois, before returning to Montana to file for divorce. On March 14, 1978, the mother accompanied them to the airport, where the father purchased round-trip tickets. He and the boys flew to Illinois. On March 28, 1978, the day before their scheduled return, he telephoned the mother to tell her they were not returning to Montana, and that he intended to file for divorce in Illinois.

On April 3, 1978, the father filed an action in the circuit court of Cook County for dissolution of the marriage and custody of Noah and Jason. Two days later the mother filed a parallel action in Gallatin County, Montana, seeking the same relief. The father was served with summons in the Montana proceeding on May 12, 1978, but did not appear; service was not had upon the mother in the Illinois action, though the father represented to the trial court that it was attempted. On April 7, 1978, the Montana court gave temporary custody of Noah and Jason to the mother, an award that was renewed on April 24, 1978, and made permanent by the decree of June 5, 1978, which also dissolved the parties' marriage. Neither the decree of dissolution nor any other documents from the Montana proceeding made part of the record indicate the Montana court was aware of a pending Illinois action; a recitation in the order of April 24 that the father was claiming custody may permit that inference.

Meanwhile, the Illinois court awarded temporary custody of the children to the father on April 14, 1978. The mother appeared specially on May 2, 1978, and moved for dismissal of the proceedings and vacatur of

the April 14 order, arguing that Illinois lacked subject matter jurisdiction to determine custody because Montana was the children's home State and that no other jurisdictional prerequisite obtained. On September 15, 1978, this action was consolidated with the mother's concurrent petition to register and enforce the Montana decree. On September 26, 1978, the parties appeared before the court, which, in conjunction with counsel for both the mother and the father, determined that it would proceed to a custody hearing prior to ruling on the mother's aforesaid motions in order to apprise itself of the "factual basis" on which disposition of the motions would turn. Ruling on the jurisdictional issues .was therefore deferred "[u]ntil such time as the Court has sufficient facts," and evidence was received on the custody issue on September 26 and October 2 of 1978.

The evidence revealed that the Montana home of the parties had five rooms and two bedrooms, one of which was shared by Noah and Jason. Four neighbors lived within one mile of them. Driving time to Bozeman was about 15 or 20 minutes, where the nearest public library was located. The closest store was two miles away. Noah was to attend a school about 10 or 12 minutes distant by bus. At the time of the hearing, the mother had added improvements in the form of a refrigerator and a separate bed for Noah. An irrigation ditch near the house but separated from it by a fenced garden contained water for most of the summer, but the children were not allowed to play near it. For a six-week period in 1978 the water system at the house had not been functioning, during which time the parties obtained water from their neighbors; thereafter a new well was installed and at the time of trial there was running water.

Montana neighbors Jack Alberda, his wife Margery and Pamela Rock testified for the mother. Alberda's home was one-half mile from that of the parties, whom he saw between 1976 and 1978 about once or twice a week. He owned pigs and a horse which were penned about 25 feet from the Weinstein home; if snow made the road from the house one-half mile from the highway impassable, his son could get through with his four-wheel drive truck. He described the father's treatment of Noah and Jason as "very lenient." Margery Alberda had seen the mother and children nearly every day during the two-year period; she described the mother as very loving and gentle with them and the parties' home as well kept up and clean. The father played with Noah and Jason when they were at the Alberdas' home. Ms. Rock saw the mother with the children in December of 1977 and described her as having a loving relationship and "very good rapport" with them. She saw the children on four or five occasions after March 1978 in Illinois; they appeared healthy, but she noticed a change in Noah's behavior.

The mother testified that she prepared all the children's meals and read to them in the evening. She had begun to teach Noah the alphabet

and numbers, and saw to it that they were able to play with other children in the area. At the time of the hearing she had enrolled Noah in a preschool program at Wilson College in Bozeman. If given custody, she intended to remain home with the boys for about eight weeks in order to ease adjustment to their father's absence and thereafter to seek employment, in anticipation of which she had already hired as a babysitter one Cathy Batson, who lived three or four miles away. Believing Montana to be a better place than Illinois to raise the children, she did not desire or intend to leave there and relocate in Illinois. She did not use drugs or alcohol. Jason, who was 26 months old at the time of trial, would occasionally cry severely, hold his breath and lose consciousness. The mother first noticed this behavior when he was nine months old and had him examined by a pediatrician, who diagnosed no damage but prescribed medication. She testified that the father was "not interested" in Jason during the first six months of his infancy; he was not home much during that period and did not help her with Jason.

Lawrence Sikkema and Larry Sikkema, the mother's father and brother respectively, who live in Illinois, also testified on her behalf. Lawrence had visited the parties' Montana residence on three occasions, and found it a "comfortable country home." He last saw the mother and children together at his home in Lyndon, Illinois, during Christmas of 1977, at which time she attended and cared for them very well. Larry had visited the Montana home for a week in January of 1977; the mother had prepared the meals and disciplined the children. He did not approve of the father's behavior toward the children in that he was seldom home and too involved in personal affairs.

At the time of trial the father and children were living with his parents, Bernard and Sylvia Weinstein, at their Skokie, Illinois, home. Bernard Weinstein's house had three bedrooms, one of which was shared by the father and the boys. He was employed as a sales representative by a real estate firm and had flexible work hours. He visited the parties' Montana home in November of 1977, describing it as a "shack type of structure" and the boys' room as tiny. Sylvia Weinstein testified that she took care of Jason during the day while the father was at work; Noah attended a Montessori school five days per week. Her husband was home by 11 a.m. or noon every day, and one of them attended to Jason until the return of the father, who took care of the children most evenings and weekends.

The father testified that he was employed as a systems representative and picked up Noah at school after work. He intended to continue living at his parents' home. Noah will attend school two blocks away; Jason was not yet toilet trained. The parties had mutually decided to live at the Montana house, where the dirt road leading to the highway was

occasionally closed in the winter. Pigs from adjacent farms would occasionally come onto the property and flies and mice were seasonally present in the house. He acknowledged seeing insects around his parents' Skokie home.

The trial court found both mother and father "more than suitable" as custodians of the children, the determinative consideration being their future environment. In that regard it perceived "nothing wrong with area of Bozeman" but weighed the prospective situation there, with the mother working and the children in the custody of "someone the Court knows nothing of" against the Skokie home of the grandparents, "who normally would be considered more desirable than some third party to take care of the children"; it also expressed concern about "what may happen to the children in the case of an emergency, if one were to arise in Bozeman." Custody of the children was then orally awarded to the father.

Pursuant to her pretrial jurisdictional motion to dismiss heard on December 18, 1978, the mother argued that Illinois lacked subject matter jurisdiction under the criteria set forth in section 601 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 601) (hereinafter Illinois Act). Reviewing the evidence adduced at the custody hearing, the court found that it did under section 601(a)(2), in view of "[the] testimony concerning the present and future protection, or care, and training, and personal relationships of the child." It denied the mother's petition for rehearing and entered a written "Judgment for Custody," expressly incorporating its ruling on the father's petition for custody and its denial of the mother's petition to register the Montana decree. Reciting that it had jurisdiction over the parties and the subject matter and that the parties agreed "[it] should decide the question of permanent custody of the minor children of the parties based upon what is in the best interests of the children," the court found both parties were fit and proper to have custody; the father was a resident of Skokie, Cook County, Illinois, and the mother a resident of Bozeman, Gallatin County, Montana; "* * * the Illinois petition for dissolution was filed prior to the Montana petition"; and it was in the best interests of the minor children that they reside in Skokie with the father, to whom custody was thereupon granted.

## I.

The mother urges that the trial court lacked jurisdiction to make a custody determination under subsection (2) of section 601 of Illinois Act, which, together with subsection (1), established the following pertinent jurisdictional standards required to be met before the trial court could make a child custody determination by initial or modification judgment (Ill. Rev. Stat. 1977, ch. 40, par. 601(a)(1), (2)):

"\* \* \*

(1) this State is the home state of the child at the time of commencement of the proceedings, or had been the child's home state within 6 months before the commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reason and a parent or person acting as parent continues to live in this State; or

(2) it is in the best interests of the child that a court of this State assume jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with this State, and there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; \* \* \*."

While section 601 of the Illinois Act and section 3 of the Uniform Child Custody Jurisdiction Act (9 Uniform Laws Annotated 103 (1973)) (hereinafter Uniform Act) are identical (*Tanner v. Smith* (1978), 61 Ill. App. 3d 456, 460, 378 N.E.2d 166; Fleck, *Child Snatching By Parents*, 55 Chi.-Kent L. Rev. 303, 311 (1979)), the Uniform Act in its entirety did not become law in Illinois until September 11, 1979, by Public Act 81-541 (Ill. Rev. Stat. 1979, ch. 40, par. 2101 *et seq.*), subsequent to entry of the judgment appealed from.[1] We nevertheless regard the Uniform Act as pertinent to the issues raised and consider them in light of its policies. See *Tanner*, 61 Ill. App. 3d 456, 460; *Weimer v. Weimer* (1980), 82 Ill. App. 3d 290, 293, 402 N.E.2d 706.

Specifically as to section 601(a)(2) of the Illinois Act, the mother argues that on the day the father commenced his action for dissolution of the marriage and custody of the children, he could only conjecture as to the children's "future care, protection, training and personal relationships" because there was at that time no prior experience in Illinois probative of these considerations: he had been present in Illinois only two weeks, had no personal residence and had no job, his "single connection" to this State being his parents' residence in Skokie. By unilaterally removing the children to that location, he was attempting to "create his own jurisdictional facts" in contravention of the policies underlying the Illinois and Uniform Acts.

The Reporter for the Special Committee of the Commissioners on Uniform State Laws, which prepared the Uniform Act (hereinafter Reporter), has observed that, since the main inquiry under the subsection is directed toward two adults and making a prediction for the future concerning the superior ability of one of them to surround the child with the necessary security, affection and other needs of a growing child,

---

[1] The Uniform Act was enacted and in force in Montana at all relevant times.

adducement of evidence bearing upon the parents' potential future relationship with the child is "the main object of the proceedings." (Bodenheimer, *The Uniform Child Custody Jurisdiction Act*, 22 Vand. L. Rev. 1207, 1223 (1969).) Accordingly, where both prospective custodians are present in a State and there is an opportunity for a full hearing on the custody issue, the jurisdictional requirements of the Uniform Act may be satisfied. Bodenheimer, 22 Vand. L. Rev. 1207, 1229 (1969).

The Commissioners' Note to section 3(a)(2) of the Uniform Act provides the following illustration of the jurisdiction provided for therein:

> "* * * the stay-at-home parent chooses to follow the departed spouse to state 2 (where the child has lived for several months with the other parent) and starts proceedings there. Whether the departed parent also has access to a court in state 2, depends on the strength of the family ties in that state * * *."

The Note goes on to explain that jurisdiction exists only if it is in the child's interest, which "* * * is served when the forum has optimum access to relevant evidence about the child and family." The Reporter also provides a cogent example of jurisdiction under section 3(a)(2) (Bodenheimer, *The Uniform Child Custody Jurisdiction Act*, 22 Vand. L. Rev. 1207, 1226-27 (1969)):

> "* * * if the original matrimonial home was state A, where husband, wife, and children lived for a number of years before they moved to state B, where they lived for six months before they separated, and the wife returned to state A with the children, state B is the 'home state' and the left-behind husband can sue there if he wishes. *There are also strong contacts with state A which give that state concurrent jurisdiction if it is chosen as the forum state.*" (Emphasis added.)

■■ Two requirements for the exercise of jurisdiction over a custody determination emerge from the provisions of the Uniform Act and section 601 of the Illinois Act as thus construed: a significant connection with the State by the children and one or both custodial contestants and substantial evidence bearing upon their future environment. In the present case the children were present in Illinois; the parties had been raised, married, lived several years and borne their older child in Illinois; both maternal and paternal grandparents resided here; and the father intended to do so for an indefinite period in the future. Moreover, a full contested hearing was had before the trial court with the concurrence of all parties, including the mother, who presented the testimony of witnesses from both Montana and Illinois. Under these facts the absence of immediate past connections with this State directly by the parties did not preclude its jurisdiction over the custody issue.

## II.

Does Illinois' exercise of jurisdiction contravene the policies embodied in the provisions of the Uniform Act as the mother contends? These include discouragement of self-help by disgruntled parents through child stealing, kidnapping, and various other extralegal schemes to gain possession of children, encouragement of interstate cooperation and respect for the custody decrees of sister States, and, pre-eminently, avoidance of prolonged interstate custody battles in which the children fought for usually suffer most. (Uniform Act §1.) Affirmance of jurisdiction in this instance, she claims, approves the means by which the father obtained physical custody of the children contrary to the Uniform Act.

We look to those sections of the Uniform Act relating to the proper forum for awarding child custody in concurrent jurisdiction situations for the resolution of this issue. Section 6(a) provides that priority in time of filing is determinative where both States are exercising jurisdiction "substantially in conformity with [the Uniform] Act," in the absence of a *sua sponte* decline to exercise jurisdiction by the court of first filing. (Accord, Uniform Act §6, Commissioners' Note; Bodenheimer, 22 Vand. L. Rev. 1207, 1230 (1969).) The father's action for custody in Illinois was filed two days prior to the mother's in Montana. This fact also distinguishes the cases relied upon by the mother, chiefly *Tanner, Winkelman v. Moses* (S.D. 1979), 279 N.W.2d 897, and *In re Custody of Holman* (1979), 77 Ill. App. 3d 732, 396 N.E.2d 331. *Tanner* and *Winkelman* each involved petitions to modify prior decrees that the petitioner violated by his removal or retention of the child (*Tanner*, 61 Ill. App. 3d 456, 456-57; *Winkelman*, 279 N.W.2d 897, 898), and in *Holman*, which involved parallel proceedings in Illinois and Texas, the court deferred to Texas' jurisdiction where filing had occurred there over two months prior to the filing in Illinois (*Holman*, 77 Ill. App. 3d 732, 733). Moreover, in *Tanner*, where the court found that the child's only connection with this State was her unlawful detention here by the father, the court's decision rested upon the absence of jurisdiction rather than upon the principle of *forum non conveniens. Tanner*, 61 Ill. App. 3d 456, 458-60.

Relative to her *forum non conveniens* argument, the mother's contention that the Montana court was in a better position to make a more informed determination than the trial court is unpersuasive. The custody issue was fully litigated here with numerous witnesses and extensive testimony on both sides; the Montana decree was entered *ex parte* and contained no findings of fact as to "present or future care, protection, training and personal relationships" of the children. The Illinois forum thus had superior access to relevant information, although the proper

procedure would have been to resolve those threshold questions by ruling on the pending motions prior to a hearing on the merits. See, *e.g., Tanner,* 61 Ill. App. 3d 456, 457-59.

Regrettably, contravention of the Uniform Act's laudable purposes to avoid interstate custody conflicts and promote respect for sister States' decrees had already occurred in this case when the trial court rendered judgment. Section 6 of the Uniform Act, if then applicable, would have required the court to communicate with the Montana court prior to a decision on the merits in order to determine jointly which was the more appropriate forum; on the other hand, the Montana court had an affirmative duty under subsection (6) of that section to inquire into possible custody actions pending in the courts of other States for the same children (see, *e.g., Paltrow v. Paltrow* (1977), 37 Md. App. 191, 376 A.2d 1134, 1137-39), and to communicate and cooperate with the Illinois court as to father's pending custody action. Faced with a situation in which the courts of neither State followed the precepts of the Uniform Act relating to mutual cooperation, we must now adhere to the guiding principle of the children's best interests, which, as noted above, lie in a determination by the forum with the greater access to relevant evidence about their future environment.

### III.

■■ Founded upon the "clean hands" provision of section 8 of the Uniform Act, which provides, *inter alia,* that a State possessing jurisdiction may decline to exercise it if the petitioner has wrongfully taken the child from another State or "engaged in similar reprehensible conduct * * *," the mother maintains that, inasmuch as she consistently acted diligently and in good faith whereas the father took the children to Illinois under false pretenses, it would be unfair for the court to sanction his conduct and punish hers by exercising jurisdiction. Apart from the well-established principle under both the Illinois and the Uniform Act that the children's interests must take precedence over ruffled feelings of parents and even, on occasion, the authority of the court (see, *e.g., Application of Lang* (1959), 9 App. Div. 2d 401, 405, 193 N.Y.S.2d 763, 767), the mother's conduct of the Montana proceedings renders this argument unconvincing. By her own testimony she had been informed by the father prior to his filing in Illinois that he intended to bring suit there, and she filed her special appearance in the Illinois action prior to entry of the Montana dissolution decree. Neither that decree nor any prior pleadings in the Montana action of record here indicate that court's knowledge of a pending Illinois suit. Apparently the mother did not inform the Montana court of the Illinois action, as required under section 9 of the Uniform Act, even after her knowledge of it was irrefutably

shown by her active participation. Invocation of equitable principles on her behalf is therefore inappropriate, particularly since the father did not violate any court order by removing the children to Illinois. See *Fernandez v. Rodriguez* (1978), 97 Misc. 2d 353, 411 N.Y.S.2d 134, 138.

## IV.

Finally, the mother argues that the trial court unfairly gave preference to a densely populated urban area over a rural one, and to paternal grandparents over a maternally selected babysitter in making its determination. Nothing in the written judgment order or the court's remarks in rendering its decision suggests an intrinsic preference for an urban environment. In expressing concern over the isolation inherent in the Montana environment and the potentially tragic consequences if an emergency occurred there, the court was properly positing the children's best interests as the overriding consideration in its judgment. We find no error in this, nor in a determination that favors two grandparents whose care for the children has been detailed in evidence as contrasted with a tentatively retained babysitter about whom nothing is known.

The judgment appealed from is affirmed; however, the cause is remanded with directions to the trial court to communicate to the Montana court the present disposition of the custody issue in this State and the reasons therefor. See *In re Custody of Potts* (1980), 83 Ill. App. 3d 518, 404 N.E.2d 446.

Affirmed and remanded with directions.

PERLIN, P. J., and STAMOS, J., concur.