**In the Matter of the Termination of the Parental Rights Over M.C.S., a Minor Child.**

**Nos. 18000 and 18056.**

Supreme Court of South Dakota.

Considered on Briefs April 20, 1993.

Decided July 28, 1993.

Thomas J. Johnson of Quaintance, Johnson & Starnes Sioux Falls, for appellant V.M.S.

William Fuller of Woods, Fuller, Shultz & Smith, Sioux Falls, for appellee Christian Counseling Service.

DOBBERPUHL, Circuit Judge.

V.M.S. (husband), appeals the denial of a motion questioning the circuit court's jurisdiction, the lack of evidence to support findings of fact and conclusions of law, and the failure to provide due process to him in the matter of the termination of his parental rights to M.C.S., a minor child, born to his wife, J.A.S. We reverse.

FACTS

J.A.S., the natural mother of M.C.S., is a lifelong resident of Iowa. On June 30, 1988, J.A.S. married husband, also an Iowa resident in Doon, Iowa. The couple had two children. In November or December of 1990, the couple separated with the two children living with their mother in Rock Rapids, Iowa, while husband lived in Moville, Iowa. The couple continued to visit each other. The couple had sexual inter-

course on the occasion of these visits up to and including February 14, 15, 16, 17, 1991.

In June or July 1991, J.A.S. informed husband that she was pregnant. J.A.S. told husband that the child was not his but that of J.P., a resident of Sheldon, Iowa. On October 18, 1991, J.P. stating that he was the father, signed a Consent to Termination of Parental Rights, Consent to Adoption, Waiver of Notice, and Power of Attorney pertaining to the as yet unborn child of J.A.S.

The child, M.C.S., was born on November 3, 1991, in Luverne, Minnesota, a town approximately 18 miles north of Rock Rapids, Iowa. Following the birth of M.C.S., J.A.S. traveled with the child to Sioux Falls, South Dakota, where the adoption agency, Christian Counseling Service (CCS), is located. (It is noted that SDCL 25–5A–4 requires a five day waiting period after the birth of a child before a petition for the voluntary termination of parental rights can be filed.) J.A.S. signed a petition seeking termination of her parental rights over M.C.S. In the petition, J.A.S. stated that J.P. was the natural father of M.C.S. It is not known what, if any, other evidence of paternity was presented since husband has been denied access to the file and consequently does not know the contents of J.P.'s statement. The director of CCS appeared as attorney in fact for J.P. The court was advised that J.A.S. was still married to husband, but he was not notified of the proceedings. Parental rights of the child were transferred to CCS on November 12, 1991.

It was disputed as to when husband found out about the date of the child's birth. J.A.S. and her sister say that husband was told of the birth in November 1991 and that he expressed no interest in the child. Husband says he found out the child's birth date in December 1991 and that upon finding out the date of birth he realized that the child could be his.

Husband contacted CCS concerning the child prior to the finalization of the adoption. Husband filed for divorce on April 6, 1992, in Sioux City, Iowa, listing M.C.S. as one of his three children.

On May 22, 1992, husband filed a petition for writ of habeas corpus and motion for relief from order terminating parental rights. Adoption became final before the hearing. The hearing was held on June 9, 1992. The habeas petition was denied June 25, 1992, because neither CCS nor J.A.S. had custody of M.C.S. An oral motion to require CCS to identify the adoptive parents after the court ruled from the bench that the adoptive parents were a necessary party to the habeas corpus action was denied.

## ISSUE ONE

WHETHER SOUTH DAKOTA HAD SUBJECT MATTER JURISDICTION TO TERMINATE PARENTAL RIGHTS AND DETERMINE CUSTODY OF M.C.S. ON NOVEMBER 12, 1991?

## ISSUE TWO

WHETHER A HUSBAND BENEFITING FROM A PRESUMPTION THAT THE CHILDREN BORN IN HIS MARRIAGE ARE LEGITIMATE CAN BE DENIED STANDING AND THE BENEFIT OF THAT PRESUMPTION BY THE SWORN STATEMENT OF THE MOTHER AND A MALE FRIEND THAT THE FRIEND IS THE BIOLOGICAL FATHER WHEN (1) MOTHER AND FRIEND SEEK TO TERMINATE THEIR PARENTAL RESPONSIBILITIES; AND (2) THE HUSBAND IS GIVEN NO NOTICE?

## ISSUE THREE

WHETHER THERE HAS BEEN DUE PROCESS OF LAW WHEN A HUSBAND AND PRESUMED FATHER RECEIVES NO NOTICE OF HIS WIFE'S PETITION TO TERMINATE HER PARENTAL RIGHTS OVER A CHILD BORN IN THE MARRIAGE AND LATER WHEN THE CHILD'S ADOPTION IS GIVEN FINAL APPROVAL WITHOUT NOTICE TO SAID HUSBAND?

## DECISION

Husband argues that the State of South Dakota did not have subject matter jurisdiction to determine custody of M.C.S. under the Uniform Child Custody Jurisdiction Act. CCS argues that the Uniform Child Custody Jurisdiction Act does not apply because a termination is not a "custody proceeding." Instead, CCS argues that South Dakota had subject matter jurisdiction and venue in terminating the parental rights of the child based on SDCL 25–5A–5 because (1) the authorized agency, CCS, was based in Sioux Falls, (2) the child was in the physical custody of CCS at the time of the termination proceeding, (3) the child was physically present in South Dakota at the time of the termination proceeding.

The Uniform Child Custody Jurisdiction Act (UCCJA) was promulgated in 1968 by the National Conference of Commissioners on Uniform State Laws in response to jurisdictional problems in interstate custody cases which were resulting in child snatchings. 126 Cong.Rec. 22807 (daily ed. August 25, 1980) (statement of Sen. Wallop). In these cases, the child was being denied access to one parent by the unilateral actions and efforts of the other parent. Court-shopping parents were fleeing to other states seeking to obtain more favorable decrees. *Cong. Record, supra,* at 22807.

The UCCJA was enacted by the South Dakota Legislature in 1978 (S.D.Sess.L. ch. 190). *Winkelman v. Moses,* 279 N.W.2d 897, 898 n. 1 (S.D.1979). The UCCJA is intended, among other things, to assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning the child's personal relationship is most readily available. The UCCJA's underlying policy is to eliminate forum shopping and to enable the courts to act in the best interest of the child. *Zappitello v. Moses,* 458 N.W.2d 784, 786 (S.D.1990) (citing *Winkelman,* 279 N.W.2d at 898–99). South Dakota's UCCJA is currently codified at chapter 26–5A.

Case law on the issue of the applicability of the UCCJA to terminations and adoptions is mixed. CCS cites *In re Johnson,* 415 N.E.2d 108 (Ind.Ct.App.1981) in support of its argument that the UCCJA does not apply to termination proceedings. In *Johnson,* the natural father, living in Indiana, filed a petition for termination of the natural mother's parental rights seeking to open the way for a future step parent adoption without the consent of the mother. *Id.* at 110–111. The two were parents of a child in the custody of the child's parental grandparents in Illinois pursuant to a dissolution decree entered in Indiana. *Id.* at 110.

The Court of Appeals pointed out that the purpose of the UCCJA is to provide guidelines in determining a court's jurisdiction to make a custody determination.

> The instant action however was not brought for the purpose of establishing or modifying a custody decree, but rather, to terminate all parental rights of the mother. Termination of parental rights is a statutory mechanism which permits a child to be adopted without the consent of a parent.... As such, jurisdiction for the termination of parental rights is not encompassed by the UCCJA, but instead, is properly determined under the adoption statutes.

*Id.* at 110.

The court concluded the UCCJA did not apply to termination proceedings and that it had jurisdiction under the adoption statutes. *Id.*

More recent cases involving termination and adoption, however, have held otherwise as to the applicability of the UCCJA. These cases have even tended to expand the application of the UCCJA by looking to the intent of the drafters.

In *E.E.B. v. D.A.,* 89 N.J. 595, 446 A.2d 871 (1982) the Supreme Court of New Jersey applied the UCCJA to both an adoption and a habeas corpus action in the case of a child born in Ohio. A month before her birth, her unmarried natural mother made arrangements with the Ohio Welfare Department to put her up for adoption. Both

the natural mother and father signed a sworn "Permanent Surrender of Child" form. Six days after her birth, the child was delivered to prospective adoptive parents. A week later, the natural mother changed her mind and revoked the surrender. The Welfare Department did not inform the court of the revocation and the surrender was approved on the following day. Two months later, the mother instituted a habeas corpus proceeding to obtain custody of the child. *Id.* 446 A.2d at 873.

The Supreme Court of New Jersey pointed out that while the UCCJA focuses on custody disputes between family members, "its operative provisions are broad enough to include a dispute between a natural parent and adoptive parents." *Id.* 446 A.2d at 878. *Citing Slidell v. Valentine*, 298 N.W.2d 599, 601 (Ia.1980), the court stated that custody proceedings include habeas corpus actions and other proceedings under state law to determine custody. *E.E.B.*, 446 A.2d at 878.

In *Souza v. Superior Court (Bristow)*, 193 Cal.App.3d 1304, 238 Cal.Rptr. 892 (6 Dist.1987) a case which involved a stepparent adoption brought by the natural mother and her new husband in California against the child's natural father in Hawaii, the new husband argued that the UCCJA standards do not apply in an adoption proceeding. The court found this argument to be "clearly wrong." *Id.* 238 Cal.Rptr. at 895. The UCCJA regulates custody of children. An adoption proceeding to terminate parental custody rights is clearly a custody-determining proceeding of the most drastic kind.... Patently, a stepparent adoption, with its potential for completely terminating the natural father's custodial rights, is a custody-determining procedure and is equally subject to the UCCJA and the PKPA.

In another case with facts more similarly related to this case, Georgia applied the UCCJA to adoption proceedings. *Gainey v. Olivo*, 258 Ga. 640, 373 S.E.2d 4 (1988). A child was born in New York where its natural mother and father lived. From early in her pregnancy, the mother planned to place the child for adoption with an

agency. The father was contacted by the agency and he refused to surrender his parental rights. On March 26, 1986, he filed custody and paternity proceedings in New York. The next day with the mother's permission, the adoption agency transferred the child to an attorney who took the child to Georgia and placed it with the adoptive parents. On February 5, 1987, a Georgia court terminated the natural father's parental rights and approved the adoption. *Id.* 373 S.E.2d at 4–5.

The Court of Appeals ruled that the UCCJA did not apply to adoption proceedings but reversed the adoption on other grounds. The adoptive parents appealed and the natural father cross appealed arguing that the Court of Appeals had erred in concluding that the UCCJA did not apply to adoption proceedings. *Id.* 373 S.E.2d at 5.

The Supreme Court of Georgia found that the UCCJA does apply to adoption proceedings concluding that the language and purpose of the UCCJA is broad enough to encompass adoption proceedings. *Id.* 373 S.E.2d at 6, citing UCCJA, § 2, Comment. The court noted that Professor Bodenheimer, the drafter and reporter for the UCCJA, has written that the UCCJA should be applied to adoption proceedings. *Gainey*, 373 S.E.2d at 6, *citing* Bodenheimer & Neeley–Kvarme, *Jurisdiction Over Child Custody and Adoption After Shaffer and Kulko*, 12 U.C.Davis L.Rev. 229 (1979); accord McGough and Hughes, *Chartered Territory: The Louisiana Experience with the Uniform Child Custody Jurisdiction Act*, 44 La.L.Rev. 19, 27 (1983). The court also noted that in a different context it had previously defined the term custody to include termination of parental rights proceedings. *Id.* 373 S.E.2d at 7, n. 6.

In *Foster v. Stein*, 183 Mich.App. 424, 454 N.W.2d 244 (1990), a custody dispute arising out of a surrogate parenting contract, the court held that adoption proceedings were included in the definition of a "custody proceeding" because adoption proceedings are in the nature of a dependency proceeding. *Id.* 454 N.W.2d at 246.

In 1991, Wisconsin held that guardianship and termination of parental rights proceedings were "custody" proceedings under the UCCJA. In *Interest of A.E.H.*, 161 Wis.2d 277, 468 N.W.2d 190, 194 (1991). The court looked to the Commissioners' Comment to UCCJA § 3(a)(2), 9 U.L.A. 145 (1988) and determined that the UCCJA encourages "maximum contracts" with a state where the custody determination will be made. *Id.* 468 N.W.2d at 199.

> More importantly, the Commissioners' comment to the definition of "custody proceeding" under the UCCJA states that " 'custody proceeding' is to be understood in a broad sense. The term covers habeas corpus actions, guardianship petitions, and other proceedings available under general state law to determine custody."

*Id.* citing 9 U.L.A. 134. *See also*, 126 Cong.Rec. 22810 (daily ed. August 25, 1980).

The court then applied the custody application of guardianship to a termination of parental rights by pointing out that if the parental rights are not terminated, the parent may retain guardianship and custody of the child. "If the parental rights are terminated, the court transfers guardianship and custody of the child to another individual or agency." *A.E.H.*, 468 N.W.2d at 199. It is the termination of parental rights that ultimately determines the retention of custody and guardianship of a child. *Id.* 468 N.W.2d at 200.

Based on current case law and the broad interpretation of "custody" being found by state courts which have adopted the UCCJA, the UCCJA is applicable in the case of M.C.S.

We have previously stated that a finding of any of the four grounds under SDCL 26–5A–3 is sufficient to confer jurisdiction over interstate child custody disputes in a state court. Once it is determined that jurisdiction exists under SDCL 26–5A–3, then the court must determine whether jurisdiction should be exercised in view of SDCL 26–5A–6 (simultaneous proceedings in other states), 26–5A–7 (inconvenient forum), and 26–5A–8 (reasons of conduct). *Zappitello*, 458 N.W.2d at 787.

The first ground is that the forum is the home state of the child. SDCL 26–5A–3(1). "Home state" as defined under SDCL 26–5A–2(5) includes where the child has lived for the prior six months or where the child has lived from birth with a parent. M.C.S. was only nine days old at the time of the petition so the six months cutoff is eliminated. M.C.S. was born in Minnesota and was in the custody of her mother, an Iowan until the court turned custody over to CCS on November 12, 1991. As seen in *In re Lehr's Guardianship*, 249 Iowa 625, 87 N.W.2d 909, 912 (1958), young children are not sui juris. Their domiciles are established by operation of law and are that of their guardians. M.C.S.'s parents are her natural guardians. M.C.S.'s natural mother J.A.S., and father, whether V.M.S. or J.P., all live in Iowa.

The statute says that periods of temporary absence of the parent are counted as time in the home state. SDCL 26–5A–2(5). Whether J.A.S. returned to Iowa after her child's birth in Minnesota or drove directly to South Dakota with the child does not change the fact that her absence from Iowa was temporary. South Dakota did not qualify as M.C.S.'s home state prior to November 12, 1991.

The second ground is that "the child and his parents, or the child and at least one contestant, have significant connection with this state...." SDCL 26–5A–3(2).

Husband and the man she named as the child's father are all Iowans. None of the three work in South Dakota. Other family members, including the couple's two children, are in Iowa. The child, M.C.S., was not conceived nor born in South Dakota. Husband did not tell J.A.S. to take M.C.S. to South Dakota nor did he apparently know until after the fact that J.A.S. had taken M.C.S. to South Dakota for adoption. Husband filed for divorce in Iowa claiming parentage of M.C.S. prior to the finalization of the adoption. Only CCS, the adoption agency, is in South Dakota.

" 'Physical presence' of the child alone does not suffice to confer jurisdiction." *In re Guardianship of Donaldson,* 178 Cal. App.3d 477, 223 Cal.Rptr. 707 (5 Dist.1986) (citing Commissioner's Note 9 Uniform Laws Annot. (1973) at pp. 124–125 § 5152 subd. (2) [§ 3, subd. (d) ]). "The 'significant connection' basis for jurisdiction requires maximum rather than minimum contact with the state and is intended to limit rather than proliferate jurisdiction." *Donaldson,* 223 Cal.Rptr. at 713 (citations omitted). "[T]he unilateral movement of a child to another state is not enough to confer jurisdiction...." *A.E.H.,* 468 N.W.2d at 201 (citing Commissioner's comments). M.C.S.'s most significant connections were in Iowa prior to November 12, 1991.

The third ground is that "[t]he child is physically present in this state *and* the child has been abandoned or it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent." SDCL 26–5A–3(3) (emphasis added).

The UCCJA as adopted by Congress states:

(a) a court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(3) the child is physically present in this State *and* (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected;

*Cong.Rec., supra,* at 22811. (emphasis added). *See also,* 28 U.S.C.S. § 1738A (Law.Co-op.1989).

According to the Congressional Record on the adoption of the UCCJA:

Paragraph (3) of subsection (a) retains and reaffirms parens patriae jurisdiction, usually exercised by a juvenile court, which a state must assume when a child is in a situation requiring immediate protection. This jurisdiction exists when a child has been abandoned and in emergency cases of child neglect. Presence of the child in the state is the only prerequisite. This extraordinary jurisdiction is reserved for extraordinary circumstances. *See application of Lang,* 9 App.Div.2d 401, 193 N.Y.S.2d 763 (1959). When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph.

*Cong.Rec., supra* at 22811.

By omitting the numbering on the subsections of the UCCJA, the South Dakota legislature may have muddled the meaning to a certain extent but there is no indication that they intended to change the meaning of the paragraphs.

Clearly, at the time of the court case dealing with the petition, M.C.S. was physically present in the state of South Dakota. However, M.C.S. was not abandoned nor does the record reveal any evidence of mistreatment, child neglect, or abuse necessary to assume jurisdiction in an "emergency" situation. Both elements are necessary to meet the third ground.

The fourth ground is that no other state appears to have jurisdiction under the first three grounds. SDCL 26–5A–3(4). That is not the case here. Iowa has jurisdiction under the first two grounds.

If J.A.S. was trying to avoid giving husband his rights as a father by bringing the child to South Dakota there may be a good reason. Caselaw shows that the State of Iowa has a strong presumption of legitimacy for children born during marriage. In *State v. Romaine,* 58 Iowa 46, 11 N.W. 721 (1882), a proceeding concerning the maintenance of an illegitimate child, the Iowa Supreme Court stated that:

It appears to us that the true rule adduced from the authorities, as well as from principle, is that a child born in wedlock, whether begotten before or after marriage, is presumed to be the child of the husband but that such presumption may be rebutted by strong, satisfactory, and conclusive evidence that the husband *did not have access to the*

*mother of the child when it was begotten.* (emphasis added).

*Id.* 11 N.W. at 722.

■ The Supreme Court of Iowa has gone so far as to view legitimacy as "akin to the presumption of innocence." *Kuhns v. Olson,* 258 Iowa 1274, 141 N.W.2d 925, 926 (1966) (citations omitted). The law presumes the legitimacy of a child born in wedlock. The presumption of legitimacy is rebuttable by clear, strong and satisfactory evidence. *In re Marriage of Schneckloth,* 320 N.W.2d 535 (Ia.1982) citing *Kuhns,* 141 N.W.2d at 926. The Court has extended the presumption of legitimacy to a child conceived in wedlock notwithstanding its birth after termination of the marriage. *Id.* 141 N.W.2d at 927. "[E]very child conceived in wedlock is legitimate; the laws having a confidence in the mother, as if she were chastity itself." *Id.* citing Montesquieu, *The Spirit of the Laws,* Book 6, Chapter 17.

Paternity in Iowa on the other hand must be established in a chapter 252A action and must be shown by a preponderance of the evidence. *Moody v. Christiansen,* 306 N.W.2d 775, 777 (Ia.1981) citing § 252A.6(11), The Code 1981. In *Moody,* the evidence of paternity included:

1. Birth of a child in August 1971 after a sexual relationship in November and December of 1970 and January 1971.

2. Pregnancy confirmed by test in late December.

3. The mother testifying that the two parties had been cohabitating and that *she had engaged in intercourse with no other person.* (emphasis added).

4. Admission by the alleged father that he had a sexual relationship with the mother as late as November 1970.

*Id.* at 777.

Even with the presumption, the husband was found not to be the father of a child born during the marriage in *Schneckloth* where:

1. The husband testified to nonaccess.

2. A blood test showed that the husband "could *not* have fathered [the child]...." (emphasis in the original).

*Schneckloth,* 320 N.W.2d 535, 536–37 (Ia. 1982)

The only proof of paternity J.P. and J.A.S. appear to have offered is their statements that J.P. is the father. Husband states that he had sexual intercourse with J.A.S. at a time when conception could reasonably have occurred. J.A.S. has not refuted that statement.

Permitting J.A.S. to change the jurisdiction of the state by merely carrying the child across the border from Iowa into South Dakota would be to abandon the very purpose of the UCCJA, that of eliminating forum shopping for the custody of children. It is vital that the underlying policy of the UCCJA remain intact enabling the court to concentrate, not on what one spouse might want over what the other spouse might want, but what is foremost in the best interest of the child.

The UCCJA applies in this termination of parental rights. Under the grounds applying the UCCJA, South Dakota does not have subject matter jurisdiction; Iowa does. The action of the court in the termination of parental rights is therefore void due to lack of subject matter jurisdiction.

Because the State of South Dakota does not have subject matter jurisdiction under the first issue, issues two and three are moot.

MILLER, C.J., and WUEST, J., and MILLER, Circuit Judge, concur.

SABERS, J., concurs in result.

DOBBERPUHL, Circuit Judge for HENDERSON, J., disqualified.

RONALD MILLER, Circuit Judge for AMUNDSON, J., disqualified.

SABERS, Justice (concurring in result).

This is a blatant attempt to terminate the parental rights of a father to his child without serving him with the proper papers. SDCL 15–2–30 provides:

An action is commenced as to each defendant when the summons is served on him, or on a codefendant who is a

joint contractor or otherwise united in interest with him.

In addition, it is an attempt to do it in the wrong state. Because there was no service of process, there was no personal service upon Father and the entire attempt is void. *See In re Gillespi,* 397 N.W.2d 476 (S.D. 1986) ("If there is no statutory exception, and there is not, the summons is a jurisdictional requirement. Where there has been a failure to issue or file or serve a summons, the court has no jurisdiction.... Therefore, the right and power of the lower court to adjudicate concerning the subject matter never came into existence because the proceeding was, inceptually, fatally flawed." *Id.* at 478 (citations omitted) (Henderson, J., concurring specially).) The South Dakota Court cannot acquire any jurisdiction over the person or the subject matter of the action since there was no service on Father. *See Gillespi,* 397 N.W.2d at 478. (Personal service is mandatory in order for trial court to have jurisdiction. Absent this service, jurisdiction is totally lacking. *Id.*) *See also* SDCL 15–6–1, 2, 3 and 4(g).

The 6 page discourse on the Uniform Child Custody Jurisdiction Act (UCCJA) is neither relevant nor necessary. *See Zappitello v. Moses,* 458 N.W.2d 784 (S.D.1990) (UCCJA intended to prevent difficulties arising out of divorce and child custody disputes). The UCCJA was intended to resolve custody disputes among parties of different states and was never intended to be used to terminate parental rights in cases where both parents live in the same state. Here, both parties lived in Iowa at all relevant times. As this court stated in *Zappitello,*

> The UCCJA is intended to apply to all "court decision[s] and court orders and instructions providing for the custody of

a child, including visitation rights; it does not include a decision relating to child support or any other monetary obligation of any person[.]" SDCL 26–5A–2(2). Further, the UCCJA provides that the term "custody proceeding" includes "proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings[.]" SDCL 26–5A–2(3). Thus the UCCJA was intended to *limit jurisdiction in interstate custody disputes.*

458 N.W.2d at 786 (citations omitted) (emphasis added).*

In *D.L. v. D.L.,* Father's parental rights were terminated and Father appealed alleging the proceeding terminating his parental rights was flawed because the petition failed to conform to the requirements of the Missouri UCCJA. The Missouri Court of Appeals held that the petition for termination satisfied the statutory requirements for termination and stated that "[t]he UCCJA is designed to assure the litigation considering the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection" and Father has failed to show how the UCCJA applies to a termination proceeding. *D.L. v. D.L.,* 798 S.W.2d 220, 224 (Mo.Ct.App.1990) (citation omitted).

As in Missouri, our legislature has enacted statutes which specifically apply to the termination of parental rights. *See* SDCL Ch. 25–5A. There is a total failure to "show how the UCCJA would apply to the facts and circumstances in the instant case." 798 S.W.2d at 224. Regardless, even UCCJA proceedings are void unless

---

* [T]he UCCJA is designed to: (1) avoid jurisdictional competition and conflict; (2) promote cooperation with the courts of other states; (3) assure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available; (4) discourage continuing controversies over child custody; (5) deter abductions and other unilateral removals of children undertaken to obtain custody awards; (6) avoid re-litigation of custody decisions of other states; (7) facilitate the enforcement of custody decrees of other states; (8) promote and expand the exchange of information and other forms of mutual assistance between courts; and (9) make uniform the laws of those states which enact it. *Id.* (citation omitted).

they are started with service of process upon Father. *See* SDCL Ch. 15–6.