In the Matter of B.B.R.

Appeal of M.R.

No. 88–529.

District of Columbia Court of Appeals.

Argued Oct. 11, 1989.
Decided Nov. 2, 1989.

---

Stephen A. Fennell, with whom Frank B. Stilwell III, Washington, D.C., and Mary Woodson Poag, Dallas, Tex., were on the briefs, for Marita Rogers, appellant.

Steven M. Schneebaum, with whom Judith Bartnoff and Daniel M. Flores, Washington, D.C., were on the brief, for Alan and Kathy Platt, appellees.

Before STEADMAN, SCHWELB and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

The issue in this case is whether the courts of the District of Columbia or of California are to determine the future of a four-year-old boy born of a mother in California but who has resided since he was two days old with a married couple in the District, despite the California mother's repeated calls for his return to her. Couched in the language of the law, the issue we must decide is whether the District of Columbia courts have jurisdiction under a federal statute, the Parental Kidnapping Prevention Act of 1980 (the "PKPA" or the "Act"), 28 U.S.C. § 1738A (1982), to entertain a petition for adoption of a child in the physical custody of a D.C. couple when the natural mother has previously sought return of the child by initiating a proceeding for a custody determination in the courts of California. We hold that California has exclusive jurisdiction under the PKPA and accordingly reverse the trial court's grant of adoption.

I

The largely undisputed facts in this case have been set forth in no fewer than four published opinions.[1] As pertinent to our disposition here, they may be summarized as follows. On June 14, 1985, Marita Rogers, a resident of California, gave birth to a boy at Sutter Memorial Hospital in Sacramento, California. She had previously spoken to her obstetrician about the possibility of placing the child for adoption, since she already had one child who was mentally retarded and required much attention. The obstetrician had thereupon been in contact with Alan and Kathy Platt, residents of the District. Within hours of delivery, Ms. Rogers signed a "release," in which she agreed to allow the hospital to release her child to the Platts, while expressly retaining all parental rights.[2] The Platts arrived

1. *Platt v. Rogers,* 114 W.L.R. 801 (D.C.Super.Ct. March 21, 1986) (hereinafter *Platt I* ); *Rogers v. Platt,* 245 Cal.Rptr. 532, 199 Cal.App.3d 1204 (1988) (hereinafter *Platt II* ); *Rogers v. Platt,* 641 F.Supp. 381 (D.D.C.1986) (hereinafter *Platt III* );

*Rogers v. Platt,* 259 U.S.App.D.C. 154, 814 F.2d 683 (1987) (hereinafter *Platt IV* ).

2. The release involved completion of a prepared form, entitled "Health Facility Release Report of Minor to Other Than a Parent or Legal Guardi-

in California on June 15. Mr. Platt added his signature to the release form that Ms. Rogers had signed, acknowledging his understanding of its terms.[3] Furthermore, Ms. Rogers' obstetrician and a hospital social worker carefully explained the terms of the release to the Platts. That day, the hospital released the child to them and the next day the Platts and the child flew back to the District, where they have lived together ever since.

On June 18, 1985, Ms. Rogers informed her obstetrician that she had changed her mind and now wanted her child back. The obstetrician then telephoned the Platts and told them that Ms. Rogers wanted her child back. Ms. Rogers also told the hospital social worker that she had changed her mind and successfully prevailed on a lawyer with whom she had had dealings to telephone the Platts to communicate the same information to them. The Platts did not comply with Ms. Rogers' attempts to have her child returned.[4]

On November 21, 1985, Ms. Rogers commenced a proceeding in the Superior Court of California in Sacramento to obtain custody of her child.[5] The Platts followed suit the next day by filing a petition for appointment of a guardian in the Superior Court of the District of Columbia.[6]

On March 21, 1986, the D.C. Superior Court concluded that the District of Columbia was the child's "home State" for purposes of the federal Parental Kidnapping Prevention Act and that the D.C. Superior Court therefore had exclusive jurisdiction to entertain the Platts' petition. *Platt I, supra* note 1, 114 W.L.R. at 808. On May 22, 1986, the California Superior Court concluded that California, not the District of Columbia, was the child's "home State" and that exclusive jurisdiction under the PKPA was therefore in the California courts. The California court awarded temporary custody to appellant on May 22, 1986. Although adopting different reason-

---

an" (State of California, Health and Welfare Agency, Department of Social Services), which stated in pertinent parts:

> I, Marita Rogers, the parent of Baby Boy Rogers, authorize Sutter Memorial Hospital to release my child to Alan and Kathy Platt residing [in Washington, D.C.]. In releasing my child from hospital for the purpose of Adoption Planning, I retain all parental rights to his/her custody and control. This only authorizes release of my child from the hospital. The adoption petition should be filed with 30 days or the Department [of Social Services] will make an investigation.

The form also stated:

> This health facility release form is not a relinquishment of consent for adoption.
>
> .     .     .     .     .
>
> The parent retains all responsibility for the child's custody and control until the court issues the adoption decree. The parent has the right to reclaim the child at any time prior to signing the consent to the adoption.

3. The acknowledgment, appearing directly below the parent's authorization, *see supra* note 2, read: "I/we have on this date received Baby Boy Rogers for the purpose of Adoption Planning. I/we understand that this only authorizes release of this child from the hospital. This is not a consent or relinquishment of this child for adoption."

4. The trial court made specific findings that the mother's wish to have the child returned was

communicated to the Platts soon after the birth of the child. The trial court recognized the possibility that the Platts may have misunderstood the communications, noting that their attachment to the child may have led them to be "selective in what [they] wanted to hear." The court found, however, that the Platts "knew from their conversations with [Ms. Rogers] and others that she at least was having some very serious second thoughts and that with a little probing they would have learned, prior to her filing a lawsuit in California, that she had in fact changed her mind."

5. Specifically, Ms. Rogers filed a petition for a writ of habeas corpus, directing the Platts to appear with the child in California before the court. She was represented, as of October 9, 1985, by Community Legal Services of McGeorge School of Law in Sacramento. The California Superior Court issued the writ on November 21, 1985. *Platt I, supra* note 1, 114 W.L.R. at 801 & 807.

6. Both parties filed additional pleadings during the course of the months following November 21, 1985. Ms. Rogers filed a *Complaint to Establish Parental Relationship in the California* Superior Court on December 13, 1985. The Platts filed a petition for temporary custody on December 10, 1985 and a petition for adoption on February 18, 1986 in the D.C. Superior Court. The D.C. Superior Court consolidated all three of the Platt petitions.

ing,[7] the California Court of Appeal affirmed the custody decision on March 29, 1988. *Platt II, supra* note 1. Meanwhile, appellant had filed a counterclaim on November 10, 1987 to enforce the California decree in the D.C. Superior Court, as well as a counterclaim for custody and a petition for a writ of habeas corpus.

After a delay caused by abortive litigation in the federal courts here,[8] the Platts' adoption petition went on to trial in the D.C. Superior Court on April 6–12, 1988. The court granted the Platts' adoption petition and denied enforcement of Ms. Rogers' counterclaims. The court pretermitted the question of whether the Platts had wrongfully retained custody of the child, reasoning that although Ms. Rogers had sought

return of her child and the Platts' right to custody was limited from the start by the clear language of the release form, it was now in the child's best interests to remain with his new family, the Platts.[9] It is from this order that the current appeal is taken.

## II

The controlling statute here is the Parental Kidnapping Prevention Act,[10] enacted by Congress in 1980 to deal with the recurring problem of interstate controversies over child custody decisions. The Act establishes criteria to determine which state shall have jurisdiction over custody disputes where more than one state can assert an interest in the matter. Thus, the Act establishes the conditions under which one state must give full faith and credit to

---

7. The California Court of Appeal did not conclude, as the Superior Court had, that California was the child's "home State" but affirmed the jurisdictional determination on the ground that the child had more significant connections to California than to the District of Columbia, *Platt II, supra* note 1, 199 Cal.App.3d at 1214–15, 245 Cal.Rptr. at 539, and indeed that under the circumstances of this case, involving what it termed the "unlawful detention" of the child in D.C., California was the only appropriate jurisdiction. *Id.* at 1216, 245 Cal.Rptr. at 540.

8. Ms. Rogers filed an action in the U.S. District Court here seeking a resolution of the jurisdictional dispute. The trial court's determination that California had exclusive jurisdiction, *Platt III, supra* note 1, 641 F.Supp. at 389, was reversed on appeal on the ground that the PKPA did not confer jurisdiction on federal courts to interpret its provisions in suits brought by private litigants. *Platt IV, supra* note 1, 259 U.S. App.D.C. at 166–67, 814 F.2d at 695–96. The Supreme Court affirmed this proposition in *Thompson v. Thompson,* 484 U.S. 174, 187, 108 S.Ct. 513, 519–20, 98 L.Ed.2d 512 (1988) (PKPA does not permit "inferring a cause of action in federal court to determine which of two conflicting state custody decrees is valid").

9. The trial court also revisited the jurisdiction issue, again holding that D.C. had jurisdiction. The trial court concluded that neither California nor D.C. was the child's "home State" but that the child had "numerous and substantial" connections to the District and only one connection —namely, the occurrence of his birth—in California. In addition, the court concluded that evidence of the child's "present or future care, protection, training, and personal relationships" was available in D.C. and not in California.

The trial court granted an adoption over the natural mother's objection pursuant to D.C.Code § 16–304(e) (1989 Repl.): "The court may grant

a petition for adoption without [a parent's consent], when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child."

10. The parties rely also on the Uniform Child Custody Jurisdiction Act (the "UCCJA"), 9 U.L.A. 115–331 (West 1988) (enacted 1968), model legislation adopted by every state. D.C.Code §§ 16–4501 to 16–4524 (1989 Repl.); Cal.Civ. Code §§ 5150 *et seq.* (West 1983). The UCCJA, drafted before the PKPA, was designed to address the same child custody problems addressed by the PKPA. Provisions of both statutes pertinent to this case are nearly identical and therefore UCCJA commissioners' comments are often additional sources of authority as to the purposes of the PKPA.

One difference between the UCCJA and the PKPA found in a provision pertinent to this case concerns pendency of preexistent proceedings. *See infra* note 12 and accompanying text. The UCCJA requires abstention by a second court when a first court has assumed jurisdiction "substantially in conformity with this chapter." D.C.Code § 16–4506(a) (1989 Repl.); Cal.Civ. Code § 5155(1) (West 1983). The PKPA requires abstention when the first court has assumed jurisdiction "consistently with the provisions of this section." 28 U.S.C. § 1738A(g) (1982). This difference proves immaterial under the facts of this case. As a general rule, even though the PKPA does not completely preempt state child custody jurisdiction law, when compliance with both the UCCJA and the PKPA proves "literally impossible," the PKPA controls pursuant to the supremacy clause. Coombs, *Interstate Child Custody: Jurisdiction, Recognition, and Enforcement,* 66 MINN.L.REV. 711, 822–23, 832 (1982); U.S. Const. art. VI, cl. 2 (supremacy clause); *In re McBride,* 469 So.2d 645, 646 (Ala.Civ.App.1985).

the custody decrees of another state.[11] In addition, the Act establishes the conditions under which a state must refrain from entertaining a custody proceeding when a proceeding in the same matter is pending in another state:

> A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.

28 U.S.C. § 1738A(g) (1982) (hereinafter, "subsection (g)" or "subs. (g)").[12] It is this subsection that controls the dispute before us. If at the time the first proceeding was filed here in the District, there was already pending in California a proceeding where the court was "exercising jurisdiction consistently with the provisions of this section," then the District was precluded from proceeding with any action here.[13]

▆▆▆ A court exercises jurisdiction "consistently with the provisions" of the Act if the court has jurisdiction under the law of the state in which it sits, *id.* § 1738A(c)(1), and if one of several conditions is met:

> (A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent

from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

> (B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships....

*Id.* § 1738A(c)(2).

The Act defines "home State" as:

> [Clause 1:] the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as a parent for at least six consecutive months, and [Clause 2:] in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period[.]

*Id.* § 1738A(b)(4).

Thus, under the structure of the Act, if any state qualifies as the "home State," that state has exclusive jurisdiction over custody matters. Otherwise, a state that

---

**11.** The PKPA applies to the District of Columbia, as well as to the states. 28 U.S.C. § 1738A(b)(8) (1982). To avoid confusion over use of the word "jurisdiction," which has two distinct meanings in the context of this opinion, we use the word "state" to apply to the District of Columbia.

**12.** The corresponding provision in the UCCJA, entitled "Simultaneous proceedings in other states," states:

> The Superior Court shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because the District is a more appropriate forum or for other reasons.

D.C.Code § 16–4506(a) (1989 Repl.); Cal.Civ. Code § 5155(1) (West 1983) (with minor word changes).

**13.** Thus, subsection (g) establishes a first-in-time rule for determining which state's jurisdiction is to be exclusive. *See also* UCCJA § 6, commissioners' comment, 9 U.L.A. at 220 (West 1988) (enacted 1968) ("[w]hen the courts of more than one state have jurisdiction ... priority in time determines which court will proceed with the action"); 1 J. McCahey, M. Kaufman, C. Kraut, J. Zett, G. Bailey, A. Volenik, Child Custody & Visitation: Law and Practice § 4.06[3][b][i], at 4–103 to 4–104 (1989) ("[p]riority in commencement of custody proceedings determines which of two states having jurisdiction shall proceed with the action" under both the UCCJA and PKPA).

meets the qualifications of subsection (B)— in particular, the "significant connection" requirement—has exclusive jurisdiction as long as the litigation before it commenced prior to litigation in any other state also meeting the requirements of subsection (B).

We do not think [14] the District of Columbia could be found to be the child's "home State" in November 1985, when the actions were commenced in California and D.C.[15] The plain language of the definition of "home State" does not allow for this conclusion. The child did not "live from *birth*" in the District. He lived in the District only from two days *after* birth. Hence, the District of Columbia cannot be seen as the "home State." [16] Whether California was the "home State" is more problematic. Indeed, the California Court of Appeal found that California was not the "home State." *Platt II, supra* note 1, 199 Cal.App.3d at 1214, 245 Cal.Rptr. at 538. We need not reach that issue, however, since we conclude, as did the California Court of Appeal, that in any event California met the requirements of subsection (B), to which we now turn.

The PKPA contemplates the possibility that a child may have no "home State," subs. (c)(2)(B)(i),[17] and provides in this situation for an alternative basis on which a court may assert jurisdiction. Subsection (c)(2)(B)(ii) allows for an assertion of jurisdiction when a court has jurisdiction under its state's law and when such an exercise of jurisdiction is

> in the best interest of the child because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships.[18]

California met the requirements of this provision on the relevant date of November 21, 1985.[19] Subsection

---

**14.** The local federal District Court reached the same conclusion, noting that "the child could not have 'lived from birth' in the District of Columbia." *Platt III, supra* note 1, 641 F.Supp. at 386.

**15.** The state must be the child's "home State" "on the date of the commencement of the proceeding" or within six months prior thereto if the child is absent from the state because of his removal or retention by a contestant. 28 U.S.C. § 1738A(c)(2)(A) (1982).

**16.** Appellant argues that "functionally" the District has been the child's home state. The purpose of the statute, however, is to establish clear guidelines for determination of jurisdiction and it is not illogical to think that the drafters had in mind only a situation where the child was born and continued to live in the state of birth up until the relevant events occurred. As can be seen from an examination of the requirement for "home State" status for a child more than six months old, 28 U.S.C. § 1738A(b)(4) (clause 1) (1982), an extended and exclusive connection with one state for the entire relevant period seems contemplated.

**17.** It should not be surprising, given the PKPA's definition of "home State," that some children will be without home states. One can imagine a variety of common situations where this would be the case. For example, a mother could give birth to a child in state 1, then move to state 2 a month later. Five months later, a person could abscond from state 2 with the child and remove him to state 3. Were the mother to commence a custody action at this time, neither state 1, state 2 nor state 3 would qualify as the "home State." Another example would be a child born in state 1, voluntarily given over to the mother's parents in state 2, and then removed by the father to state 3. In this case, if the child's grandparents are not parties claiming a right to the child, the child's stay in state 2 results in the child's being without any "home State."

**18.** The use of the word "because" at the start of this passage indicates that for purposes of the PKPA the phrase "best interest of the child" is defined by the two stated elements.

**19.** Neither party questions that both the California and D.C. Superior Courts had jurisdiction over this child custody dispute under their respective state laws. In addition, "substantial evidence concerning the child's present or future care, protection, training, and personal relationships" is available in both states, as required by subsection (c)(2)(B)(ii)(II). As to California, the child's mother lives there and she is the most appropriate source of information about the future care, protection, training and future relationships the child would experience were he to be returned to her. In their brief, appellees do not allege that substantial evidence is lacking in California.

(c)(2)(B)(ii)(I) requires that on the date when Ms. Rogers commenced her action in the California court, "the child and his parents, or the child and at least one contestant, have a significant connection with" California. In this case, there is no question that the child's mother, Ms. Rogers, had a significant connection with California since she was then and remains now a resident of that state. The only real issue is whether the child had such a connection.[20] The child was born in California, in a California hospital. He remained there for the first two days of his life. The child thereafter remained significantly connected with California since it was in California that his mother and the Platts signed a contractual agreement, governed by California law, establishing the terms of his removal to and continued presence in the District. The rights of the Platts to bring him to the District initially and to continue to hold him here, if legitimate at all, were founded on that agreement. The terms of the agreement made clear that the child's legal custody remained with his mother, a California resident. *See supra* note 2. The agreement also provided that adoption proceedings should be filed within 30 days, presumably in California, or the California Department of Social Services would make an investigation. *Supra* note 2. The child remained yet further connected to California by virtue of the presence there of a sibling. We conclude[21] that even assuming no one of these ties to California would by itself suffice, taken as a whole[22] they constitute a "significant connection."[23]

**20.** We note that the statutory language requires that the child have "*a* significant connection" (emphasis added) with the state at issue. This threshold requirement is in keeping with a general purpose of the PKPA to reduce "jurisdictional competition" among states by conferring jurisdiction on one state with a significant connection. 28 U.S.C. § 1738A note § 7(c)(5) ("Congressional Findings and Declaration of Purposes for Parental Kidnapping Prevention Act of 1980"). *See infra* note 23.

**21.** The PKPA does not make clear whether a court of a state that has assumed jurisdiction while a proceeding is pending in another state, as in this case, may evaluate de novo whether that other state assumed jurisdiction "consistently with the provisions" of the Act. To provide finality in this proceeding, we have evaluated the connections de novo and concluded that the child had a "significant connection" with California. Of course, were we (as may well be prudential if not mandatory) to defer in any degree to the California Court of Appeal's "significant connection" determination, we would reach the same result.

**22.** Even if the stated ties were deemed insufficient, we think a court could legitimately take into account the circumstances under which further ties to the state were thwarted by wrongful acts of a contesting party. Here, for instance, had the Platts returned the child promptly to the mother upon her initial request, the ties with California would have been overwhelming.

**23.** As we read subsection (g) of the PKPA, a court is not directed to weigh the relative significance of connections between the child and the competing states. If there is a significant connection to state 1, state 2 must abstain from exercising jurisdiction even if there is a significant connection to it as well. As previously noted, *supra* note 13, subsection (g) establishes a first-in-time rule for determining which state's jurisdiction is to be exclusive. Such a rule makes sense given the possibility that the child may have significant connections to more than one state. *See St. Andrie v. St. Andrie*, 473 So.2d 140, 144 (La.Ct.App.1985) (noting that both Georgia and Louisiana had "'significant connections'" for purposes of Louisiana's version of the UCCJA, La.Rev.Stat. § 13:1702(A)(2), whose jurisdictional language is virtually identical to that of subsection (c)(2) of the PKPA). The court in *Platt III* noted that as a matter of statutory construction courts should strictly construe the terms of the PKPA and "refrain[ ] from balancing tests in determining jurisdiction under the PKPA" because the PKPA derogates from common law. *Platt III, supra* note 1, 641 F.Supp. at 385. Thus, although the courts in *Platt II* and *Platt III* engaged in a weighing process and found in both cases that California had more significant connections, we would not agree that subsection (g) contemplates such a process.

We do not agree with the reasoning of *In re C.L.W.*, 467 So.2d 1106 (Fla.Dist.Ct.App.1985) (per curiam), on which appellee relies. In *C.L.W.*, a Pennsylvania mother invited a Florida husband and wife to come to Pennsylvania to receive for adoption the child she was about to give birth to. The Florida wife came to Pennsylvania. Soon after delivery, the mother executed a "consent for adoption" form and the child was turned over to the wife. Just before leaving Pennsylvania with the child, however, the mother's lawyer telephoned the wife stating that the mother had changed her mind and wanted to keep the child. The wife ignored the request and returned to Florida with the child three days after the child's birth. The next day, the mother formally revoked her consent to

We reject the argument made by appellee at oral argument and implicitly accepted by the trial court as well that for purposes of "significant connection" analysis the relevant time for measuring the connection is that of our present review or some time other than that of appellant's initial filing. Jurisdiction is an initial and key element to be determined in any judicial proceeding and to make it a shifting, chameleon-like issue would be counter not only to normal legal principles but also to the structure of the Act. Thus, in subsection (A), "home State" status is determined as of the "commencement of the proceeding," *see supra* note 15 and accompanying text, and we see no reason why the same should not apply to subsection (B). Furthermore, we cannot believe that the Act contemplates an approach that would enable a contesting party, particularly where wrongdoing is involved, to build up connection time in his or her state, thereby frustrating one of Congress' purposes in enacting the PKPA—to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards." 28 U.S.C. § 1738A note § 7(c)(6) (1982) ("Congressional Findings and Declaration of Purposes for Parental Kidnapping Prevention Act of 1980").

In sum, California met the requirements of 28 U.S.C. § 1738A(c)(2)(B) on November 21, 1985, when a proceeding [24] was commenced in its courts. Consequently, subsection (g) required that the D.C. Superior Court refrain from entertaining the Platts' petitions, the first of which was filed on November 22, 1985,[25] a day after Ms. Rog-

---

adoption. She then instituted a suit for custody in a Pennsylvania court, which awarded her custody about a month later. The mother sought enforcement of the Pennsylvania decree in Florida, which was denied by the Florida court. The couple then filed for adoption in Florida, which was granted.

The Florida District Court of Appeals affirmed, noting that Florida was the child's "home State" since the child has lived her entire life with the couple exclusively in Florida. *Id.* at 1110 n. 1. The court also deemed it necessary to reach the "significant connection" prong, concluding that the child did not have a significant connection with Pennsylvania since "[t]he child's only connection with Pennsylvania [was] the mere fact of her birth [there]." *Id.* at 1110.

We do not agree with the Florida court's "home State" analysis. The court either overlooked the fact that the child was less than six months old when his mother commenced proceedings in the Pennsylvania court or thought that the relevant measuring time was that of the start of the couple's proceeding. The UCCJA, as well as the PKPA, contemplates measuring home statehood on the date of commencement of the first party's proceeding. *See supra* note 15. Nor do we necessarily accept the Florida court's limited view of the child's connections to Pennsylvania. As in this case, the legal instrument creating the terms of the child's custody was executed in the mother's state and was governed by the law of that state. Moreover, this case is distinguishable to some extent on its facts since appellant here only executed a release whereas the mother in *C.L.W.* actually executed an adoption consent.

**24.** Appellees do not argue before us that the petition for writ of habeas corpus did not initiate a "proceeding" in pursuance of a "child custody determination" for purposes of the PKPA. The PKPA defines a "custody determina-

tion" as "a judgment, decree, or other order of a court providing for the custody or visitation of a child, and includes permanent and temporary orders." 28 U.S.C. § 1738A(b)(3) (1982). A California habeas corpus petition in the context of a custody dispute is designed to produce precisely such an order. *See In re Richard,* 14 Cal.3d 783, 789, 537 P.2d 363, 366, 122 Cal.Rptr. 531, 534 (1975) ("[i]t is well settled that a person entitled to the physical custody of a child may enforce his *right* thereto as against one wrongfully withholding the child by a petition for writ of habeas corpus" (citations omitted)). *See* UCCJA § 2 commissioners' comment, 9 U.L.A. at 134 (West 1988) (enacted 1968) (the term "'custody proceeding' is to be *understood* in a broad sense. The term covers habeas corpus actions"). *Cf. E.E.B. v. D.A.,* 89 N.J. 595, 446 A.2d 871, 876 (1982), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 445 (1983) (Ohio writ of habeas corpus directing adoptive parents to present the child to the mother was a "custody determination" for purposes of the PKPA).

**25.** Subsection (g) requires the court of a second state to decline jurisdiction when a child custody proceeding is "pend[ing]" in the courts of another state. The statute does not define the word "pend[ing]." We turn to the law of the state where the initial action is allegedly "pend[ing]" to establish the definition. *See* Coombs, *supra* note 10, at 773 ("[c]ourts should construe subsection (g) to allow each state's law to determine when a proceeding in that state is commenced or begins its pendency"); *Lopez v. District Court,* 606 P.2d 853, 855 (Colo.1980) (Colorado court applied California law to determine whether proceeding was "pending" for purposes of the UCCJA).

Under California law, an action is "pending from the time of its commencement." Cal.Civ.

ers had filed her petition in California.[26]

We are not for a moment unmindful of the key figure in this woeful drama, the child himself. But it must be remembered that the decision before us is not what is to be the fate of this child but rather which court in our federal system is to have the ultimate responsibility for making that determination. The decree of the California court awarded only temporary custody based on a state of facts now over three and one-half years stale. We cannot and do not predict what the courts of that state will do in light of present realities. We simply hold that it is for them to rule.

The order granting the adoption is reversed and the case remanded to the trial court for further proceedings consistent with this opinion.[27]

*So ordered.*

Proc.Code § 1049 (West 1980). Furthermore, a civil action is "commenced by filing a complaint with the court." *Id.* § 350. Hence, in California an action is pending from the moment the complaint is filed. Ms. Rogers' petition for a writ of habeas corpus was equivalent to a complaint and therefore the proceeding was pending as of November 21, 1985. We note that we would reach the same result under D.C. law, which does not expressly define the word "pending" but which does, like California, state that "[a] civil action is commenced by filing a complaint with the Court." Super.Ct.Civ.R. 3 (1989). *See also Ex parte Blanton,* 463 So.2d 162, 165 (Ala.1985) ("[i]n Louisiana, as in Alabama, a suit is commenced when a plaintiff files a complaint, sometimes referred to as a petition, and it remains pending until terminated by a decision on the merits, or by a judgment of dismissal, or by some other action by a court" (citation omitted)). It should be noted that some courts have viewed commencement and pendency of actions differently. *Peterson v. Peterson,* 464 A.2d 202, 205 (Me.1983) (concluding that "the mere unilateral filing of a custody complaint" did not create exclusive jurisdiction under the UCCJA and PKPA in one state; Section (g) of the PKPA is triggered when a "court holds a hearing and actively assumes jurisdiction of the matter"); *Potter v. Potter,* 104 Misc.2d 930, 430 N.Y.S.2d 201, 204 (Fam.Ct.1980) ("filing does not commence an action in New York. Rather, service of a summons on respondent equals commencement of the action" (statutory citation omitted)).

**26.** We do not doubt that California's order issuing a writ of habeas corpus was a "custody

**SCHWELB, Associate Judge, concurring:**

My colleagues hold that the California courts have jurisdiction, and the District of Columbia courts do not, because Ms. Rogers won the race to the courthouse door by one day. I agree that the PKPA so provides, but I believe that we should decide the issue on broader and less fortuitous grounds than that.

In interstate custody litigation, the determination of which court decides is often of paramount importance. In the present case, for example, Ms. Rogers lives in California and the Platts are residents of the District of Columbia. When the dispute broke out, at least one side was certain to be required to engage in protracted litigation three thousand miles from home.[1] Where a party cannot afford to do this— and it appears that Ms. Rogers would not be able to afford litigation in the District

determination" for purposes of the PKPA, *see supra* note 24, and that appellees' petition for adoption was a proceeding in pursuance of a "custody determination." *See, e.g., Decatur v. Ahearn,* 89 A.D.2d 742, 744, 453 N.Y.S.2d 946 (App.Div.1982) (adoption proceeding understood to be custody proceeding for purposes of New York UCCJA).

**27.** As indicated *supra,* there remain pending before the trial court counterclaims by Ms. Rogers, including a counterclaim to enforce the California decree. *See* 28 U.S.C. § 1738A(a) (1982); D.C.Code § 16–4513 (1989 Repl.). Although provision exists for modification of decrees of other states, 28 U.S.C. § 1738A(f); D.C. Code § 16–4514 (1989 Repl.), D.C. has no present power to modify. California continues to retain exclusive jurisdiction over this custody dispute by virtue of 28 U.S.C. § 1738A(d) (1982):

The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the [court continues to have jurisdiction under the law of its State] and such State remains the residence of the child or of any contestant.

*Applegate v. Gant,* 460 So.2d 1293 (Ala.Civ.App. 1984), and cases cited; *Bahr v. Bahr,* 108 Misc.2d 920, 442 N.Y.S.2d 687 (Fam.Ct.1981), *aff'd,* 91 A.D.2d 1010, 458 N.Y.S.2d 247 (1983). *See Kumar v. Superior Court,* 32 Cal.3d 689, 652 P.2d 1003, 186 Cal.Rptr. 772 (1982).

**1.** Unfortunately, as events have turned out, both sides have now been litigating in both jurisdictions for several years, with no end in sight.

but for the willingness of counsel apparently to represent her *pro bono*,[2] an opportunity not available to many comparably situated litigants—that party is likely to lose his or her claim, no matter how meritorious it may be. Accordingly, when we decide where the case is to be tried, we may well be preordaining its result on the merits, perhaps by default. In theory, the choice is simply which of two impartial judicial systems will decide the case. In the real world, especially for a non-affluent party, the opportunity to litigate the case meaningfully may be at stake.

Under these circumstances, and where the issue relates to a right as basic as a mother's opportunity to be a parent to her child, I think it is the duty of courts to guard against attempts by parties to create jurisdictional facts through wrongful conduct and then to confront the court with a *fait accompli.* A party should not be permitted to use improper or unlawful means to create or enlarge the child's connections with the party's own state, and to reduce or destroy the child's ties to the adversary's state, and then be heard to claim that the jurisdiction of the wrongdoing party's choice is the logical and appropriate one in which to litigate. To allow a contender for custody to do this would contravene the wise policy

> that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence, this principle has been applied in many diverse classes of cases by both law and equity courts.

*Glus v. Brooklyn Eastern Terminal,* 359 U.S. 231, 232–33, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959).

Significantly, one of the stated purposes of the PKPA is to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards." PKPA § 7(c)(6), 94 Stat. 3566, 3569 (1980) (reprinted at 28 U.S.C. § 1738A note (1982)).[3] Courts have long recognized the importance of discouraging

> the resort to self-help which in the custody dispute is an irresponsible and barbaric remedy. Not only does self-help make the eventual placement of the children an arbitrary consequence, but it breeds reprisal in kind.

*Application of Lang,* 9 A.D.2d 401, 408–09, 193 N.Y.S.2d 763, 770 (1st Dept.1959). A major goal of the PKPA was to provide protection for the left-behind parent. *See Rogers v. Platt,* 641 F.Supp. 381, 388 (D.D. C.1986), *rev'd on other grounds,* 259 U.S. App.D.C. 154, 814 F.2d 683 (1987); 126 Cong.Rec. 22,807 (1980) (Senator Wallop). Under the UCCJA, too,

> the days of spiriting children across state lines to litigate custody are over. After nearly fifty years of living with the practice and the untold misery it brought, the separate states have finally enacted a law with teeth.

*Yacov Y. v. Margaret Y.,* 112 Misc.2d 623, 624, 447 N.Y.S.2d 644, 645 (1982). "Since the purpose of the [UCCJA] is to deter abductions and other unlawful conduct, it is held that a claimant cannot be permitted to rely on his or her wrongful conduct in order to establish jurisdiction in a foreign court." *Rogers v. Platt,* 199 Cal.App.3d 1204, 245 Cal.Rptr. 532, 539 (1988) (*Platt II*). Both the PKPA and the UCCJA should be construed with these considerations in mind.

The foregoing principles apply even in a contest between two parents, each of whom has a colorable claim to custody of the child.[4] The present case, however,

**2.** Ms. Rogers is represented in California by a Community Legal Services program at the McGeorge School of Law.

**3.** The UCCJA contains an almost identical provision. D.C.Code § 16–4501(5) (1989). Although Ms. Rogers' son was not unilaterally "removed" from California, he was unilaterally kept in the District even though the Platts lacked any legal basis for not returning him.

**4.** Section 2 of the UCCJA provides that the court may decline to exercise jurisdiction where a petitioner has wrongfully taken the child from another state or has engaged in similar reprehensible conduct. D.C.Code § 16–4508(a) (1989). The decision is a discretionary one. In conformity with the approach taken by the California Court of Appeal, I would hold that the option not to decline jurisdiction applies only where the petitioner has a colorable claim of right. *See* discussion at pp. 1043–1044, *infra.*

presents a situation in which the interdiction of self-help and *"faits accomplis"* takes on an even greater urgency. As the California Court of Appeal correctly stated, the Platts do not have even a colorable claim that they had the right to the custody of Ms. Rogers' son. *Platt II, supra,* 199 Cal.App.3d at 1212–13, 245 Cal.Rptr. at 537. As Justice Sparks wrote for that court in a well-reasoned opinion, "there is simply no provision in law by which an unrelated person may unilaterally take custody of a child in derogation of the right to custody of the child's natural parent." *Id.* at 1213, 245 Cal.Rptr. at 537–38.

To be sure, the Platts did not kidnap the child. I fully agree with the California court, however—indeed, the point seems to me unanswerable—that

> defendants' temporary physical custody was permissive, but their retention of the child became unlawful when they refused to return the child upon plaintiff's request.

*Id.* at 1213, 245 Cal.Rptr. at 538. Although Judge Hess made no explicit finding that the Platts' conduct was wrongful,[5] his underlying evidentiary findings to the effect that Ms. Rogers promptly asked for the return of her son and that the Platts refused to comply establish beyond peradventure that there existed no plausible legal or moral[6] basis for the retention of Ms. Rogers' son in Washington, D.C. without her consent.[7]

Ms. Rogers filed her action in California a day before the Platts filed in the District.

Moreover, in California, a case is deemed pending once filed. My colleagues conclude, correctly in my view, that on this state of facts the California court had jurisdiction, and that our trial court therefore had no authority under the PKPA to proceed with the case. Suppose, however, that the Platts had filed a day earlier in the District, or that under California law a case became "pending" only after the defendants had been served and the Platts had successfully evaded service. Should this court then say that because the child has been brought to the District, and because connections with this jurisdiction have been created for him, the case must be tried in the wrongdoers' lair, three thousand miles from the home of the child's mother? I find such a conclusion so inequitable as to be beyond endurance. In cases such as this, where the Platts' basis for retaining control of the child after the mother demanded his return is completely spurious, equitable considerations require that California be viewed as having no less connection with the child, and the District as having no more, than would have been the case but for the Platts' wrongful retention of custody.[8]

If the Platts had acted lawfully and returned Ms. Rogers' son to her within a reasonable time after her demand, the boy would have spent almost no time in the District and almost all of his time in California. California would obviously have had jurisdiction and the District would not, no matter who filed first where, and irre-

---

5. Judge Hess did imply that the Platts' refusal to return the child was reprehensible, noting that even if it were to be so characterized, that should not end the inquiry. *See also* n. 6, *infra.*

6. The Platt's reluctance to part with a child whom they had hoped to adopt is understandable but not defensible. The form which set the terms for the release of the child to them provided that *"the parent has the right to reclaim the child at any time prior to signing the consent to the adoption."*

7. Judge Hess found that the Platts knew, at least, that Ms. Rogers was having second thoughts, and that "with a little probing they would have learned, prior to her filing a lawsuit in California, that she had in fact changed her

mind. *Had they done so, their conditional right to custody would have terminated."* (Emphasis added). The judge suggested that when Dr. Platt testified that he did not regard Ms. Rogers' actions as a demand for the return of the child, "he may have been selective in what he wanted to hear." Surely Dr. Platt had no right to avoid his legal obligations by resorting to wishful thinking, when both Ms. Rogers and several intermediaries, including the social worker, had unequivocally told him that Ms. Rogers wanted her son back.

8. I also agree with the California Court of Appeal that before a person can properly be classified as one "acting as a parent" within the meaning of 28 U.S.C. § 1738A(b)(6), he or she must have at least a colorable claim to custody.

spective of what steps were needed to make a case "pending."

To permit jurisdictional "facts" created by wrongful conduct to control or affect the determination where the case is to be tried would have unjust and oppressive consequences. If the Platts can create jurisdiction in the District by keeping the boy here without authorization, then why cannot a kidnapper do the same? Moreover, if persons in the position of the Platts are permitted to enhance their opportunity to try the case in the District (and potentially win by default because of the adversary's limited means) by *not* returning the child to the mother when the mother makes a lawful demand that they do so, it becomes far more profitable for them (in terms of the opportunity to litigate here and, ultimately, to retain the child) to do wrong rather than right. The temptation to hold on, to delay, and to evade, in an attempt to convert wishful thinking into reality, may become well-nigh irresistible. Here the litigation has dragged on for four years, the child has been with the Platts, and ties have been forged. The potential trauma for the boy if he is returned to his mother is *far greater now* than it would have been if the Platts had done the right thing and returned him to her when he was only a few weeks old. I cannot believe that the PKPA and the UCCJA were intended to countenance a scenario under which, to quote Leo ("the Lip") Durocher, "nice guys finish last."

\*　　\*　　\*

All of the members of the division agree that the decision as to who shall have custody of the child must be made by the courts of California. I do not envy them that responsibility. This is a case in which, as a result of the Platts' wrongful acts, the best interests of this child may not coincide with the best interests of children generally. If courts countenance creation of a *fait accompli* through self-help, they encourage the unilateral snatching or retention of innocent children. When this occurs, it is those children who suffer most.

What is *not* in the interest of any child is to have incompatible decrees in two jurisdictions with respect to his or her custody. That was the situation for Ms. Rogers' son prior to this decision. The California courts had decreed that Ms. Rogers is entitled to temporary custody. Our trial court ruled that the Platts could adopt him, even though the California courts had held that they had wrongfully withheld him from the mother.

Such a situation is completely untenable. For one thing, it would as a practical matter frustrate any prospect that the child, if awarded to the Platts, could visit with Ms. Rogers in California. As I once wrote in an earlier judicial incarnation, in refusing to exercise jurisdiction where a mother had asked me to award her custody of her two children in contravention of an Indiana decree in favor of the father:

> One need only consider the probable consequences to the Davis children if this Court had purported to award custody to the mother. If the mother had prevailed in the District of Columbia, then the courts of the two jurisdictions would have been in direct conflict as to which parent is entitled to custody of the children. The mother would then have confronted a situation in which, if she allowed the children to visit Indiana, the courts of that state would not recognize her custody and would not require the father to return the children to her. Accordingly, there would be a compelling incentive for the mother to prevent the children from ever going to Indiana or seeing the father. If, despite that inhibition, the children ever were permitted to visit the father in Indiana, then he would have every reason to prevent them from returning to Washington, for the courts of this jurisdiction would not recognize his right to custody. The prospects of the children retaining contacts with both parents—and such contacts are in almost all cases in the best interest of the children—would be bleak indeed.

*Hamanaka v. Davis*, 111 Daily Wash. L. Rptr. 9, 13 (D.C.Super.Ct.1982).[9]

---

**9.** Indeed, even a trip across the Key Bridge with the child can be risky in such a situation. Who

In this case, the California courts have jurisdiction. The only authority which devolves upon the Superior Court of the District of Columbia relates to the enforcement of the California decree, as prayed for in Ms. Rogers' counterclaim. *See* 28 U.S.C. § 1738A(a), (f) (1988 Supp.); D.C. Code § 16–4513 (1989). I hope that this will be addressed forthwith, before new realities can be created to make the achievement of justice even more difficult.

FARRELL, Associate Judge, concurring:

I join Judge Steadman's opinion for the court, which properly analyzes and applies a statute designed to prevent just the sort of jurisdictional stalemate that has marked this case until now. The issue of permanent custody must be decided by the California courts. Like Judge Schwelb, I do not envy them that task; the wisdom of ten Solomons will not yield the "right" decision as to who shall parent this 4½ year old child into adulthood. I write separately only to express my hope that the further proceedings will not be influenced by the fact that "the best interests of this child may not coincide with the best interests of children generally." *Supra* at 1044 (Schwelb, J., concurring). That is, whatever wrongdoing the Platts have engaged in by holding fast to a child originally entrusted to them lawfully has been accounted for by our jurisdictional decision interpreting the statute consistently with its terms *and* its deterrent purpose.* I believe that on the issue of permanent custody, the best interests of *this* child should be the exclusive focus; it is unnecessary to jeopardize the child's future in order to teach the Platts (and others similarly tempted) a further lesson. For me, the dominant fact is no longer the behavior of the Platts, inexcusable as that may have been, but the evidence credited by Judge Hess that re-

moving this child from the only parents it has known may have a devastating effect on its emotional development. Indeed, the one heroic moment in this litigation has been the recognition of this possibility by the natural mother and her consequent admission in the hearing below that if it were truly in the child's best interests to remain where he is, she would not oppose adoption. The character revealed by that admission only confirms the insolubility of the custody decision.

knows whether a Virginia court would enforce the California temporary custody order or the District of Columbia adoption decree.

* In particular, we have rejected a "floating" point in time at which the determination of significant connections with a state is made in favor

of making the commencement of the proceeding decisive. We have done so in part because any other interpretation would reward a wrongdoer by permitting him or her to "build up connection time" in another state before the jurisdictional issue is decided. *Supra* at 1039.